UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DEBORAH GRIFFITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Cause No. 4:09 CV 959 DDN |
| | ) |
| CITY OF FLORISSANT, et al., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S PRETRIAL BRIEF**

Comes now plaintiff and submits the following pretrial brief. Plaintiff will prove the following facts.

Plaintiff Griffith was an employee under the civil service code of the City of Florissant and was a member of the Classified Service. (See Compliant, para. 7 and Answer, para. 7.) As such, plaintiff was entitled to notice of the charges against her and the right to contest those charges. Plaintiff had the right to a pre-termination hearing. However, Plaintiff was not provided a pre-termination hearing. (Complaint, para. 13 and Answer, para. 13.)

Deborah Griffith ("Griffith") was terminated by the Florissant Chief of Police. Plaintiff Griffith timely appealed this adverse employment action to the Mayor of the City of Florissant. The Mayor affirmed the decision of the Chief of Police.  Plaintiff Griffith then timely appealed the employment action to the personnel board pursuant to the ordinances of the City of Florissant.  Florissant ordinance 125.015 gives the Commission power and duty to "Hear and determine the appeal of all persons in the classified service from all actions of department heads or other duly authorized supervisory personnel relating to the discharge, suspension, disciplining

1

or otherwise penalizing of such persons…". Section 125.015(D)(3). Plaintiff Griffith was a classified, full time employee not on probation at the time of her termination.

Florissant uses a system of progressive discipline, using first oral warnings, then written warnings before suspension or other more severe form of discipline. Ordinance 125.240, 125.245.

The Florissant Police Department has issued General Order 3-3, which has been in effect at all times. That Order applies to discipline in the police department. The order provides that the supervisor must examine "all mitigating and extenuating circumstances, previous training, past experience, prior record of performance, conduct of employee and seriousness of the offense to render a fair and impartial decision". This order authorizes the Chief of Police to make a final determination of the discipline to be imposed from the recommended punishment from the Supervisor or shift commander's recommendation. The employee has the right to appeal any punishment to the Chief of Police. The Chief of Police must then hold a hearing, which will be recorded and at which the employee may be represented by counsel. The employee at the hearing may present relevant facts or witnesses to explain or mitigate his actions.

Sgt. Godfrey became Plaintiff Griffith's supervisor in May, 2007. He did an evaluation on Plaintiff Griffith in July, 2007, some two months later. His July, 2007 evaluation was primarily based on the two reprimands and sick leave issue. Based upon these issues, Sgt. Godfrey recommended Plaintiff Griffith not received a merit raise and be placed on probation. Plaintiff Griffith successfully completed probation and received a merit pay raise. After the July evaluation, Sgt. Godfrey counseled Plaintiff Griffith regarding her evaluation. The next evaluation done at the end of the 60 day probation period states that "Plaintiff Griffith has shown adequate improvement in all areas of concern." The two Allegations of Misconduct which

formed the basis of Sgt. Godfrey's July, 2007 evaluation are discussed below. Neither shows a serious infraction. Neither were done by Sgt. Godfrey and he made no investigation into the circumstances of either.

In 2007, Plaintiff Griffith was charged with an allegation of misconduct for pre-booking of prisoners on February 21, 2007. Plaintiff Griffith received the prisoner information from St. Louis City, where the prisoners had been arrested, and from where they were being transferred to Florissant. Plaintiff Griffith received a one day suspension for this action. Plaintiff Griffith was trained to do pre-booking, when the information was obtained from a police officer or another police department. Obtaining this information helps the patrol officer and speeds up the booking process. At a department meeting on February 28, 2007, it was announced that pre-booking of any kind was not allowed. Since that time, Plaintiff Griffith did not precook anyone and there was been no further discipline for prebooking.

Plaintiff Griffith was trained that pre-booking was permitted when the information came from another police department or from the arresting police officer. There is no manual or instruction on how to do booking, or which states pre-booking is not allowed. Plaintiff Griffith did not receive counseling telling her to cease doing prebooking before she received the Allegation of Misconduct. Plaintiff Griffith has not done pre-booking since then.

In July, 2007, Plaintiff Griffith received discipline because a prisoner had been placed in a cell in street clothes. Officer Tesson had arrested an individual, and the prisoner was combative and had to be maced. Officer Tesson placed the prisoner in the cell with his street clothes on and did not change him into a prison jumpsuit or remove his personal property. Officer Tesson did not put the prisoner in the prison jump suit, but just placed him in a cell.

Plaintiff Griffith noticed this when she was placing the female into a cell after booking her. Plaintiff Griffith then took appropriate corrective action.

The police officer is responsible for having a prisoner change into a prison jump suit and to inventory his personal property, not the corrections officer. Captain Burke, in reviewing the Allegation of Misconduct against Plaintiff Griffith and Officer Tesson, states: "In this situation, Officer Tesson is required to remain in control of the prisoner until such time as booking has been completed and the prisoner is secured in a regular cell. Further, a police officer's authority outweighs that of a correction officer". At the time Officer Tesson was placing the combative prisoner in a cell, Plaintiff Griffith was booking a drunken female. Plaintiff Griffith was given as punishment a directive to be re-instructed on proper booking procedures.

On all evaluations prior to the July, 2007 evaluation, Plaintiff Griffith was rated as satisfactory, above average or exceptional in all areas. She did not receive a below average rating on any part of an evaluation prior to the July, 2007 evaluation of Sgt. Godfrey.

After the July, 2007 evaluation, Plaintiff Griffith asked to meet with the Chief of Police by memo. The Chief granted her that request and met with her, as she has the right to request a meeting with him. After the meeting, the Chief decided to put her on a 60 day probation. None of the conduct complained of in 2007 was ever repeated after the counseling and meeting with the Chief of Police.

Sgt. Godfrey prepared an Allegation of Misconduct against Plaintiff Griffith on August 27, 2008, charging her with abuse of sick leave. The Allegation of Misconduct relating to sick leave was not considered by the Chief of Police in making the decision to terminate Plaintiff Griffith or by the Mayor. Thus, this charge forms no basis for the dismissal of Plaintiff Griffith.

On August 27, 2008, Sgt. Godfrey prepared a second Allegation of Misconduct, stating there was insubordination and neglect of duty. Sgt. Godfrey called Plaintiff Griffith and asked her to report immediately to the department regarding these two Allegations of Misconduct. Plaintiff Griffith was off duty at the time and could not immediately come, especially as she had to check on her mother who has Alzheimer's. Based upon this, Sgt. Godfrey stated on both Allegations that Plaintiff Griffith "declined meeting". Each Allegation had a reference to "see attached" which detailed the specifics of the charges. The attachments were never provided to Plaintiff Griffith prior to her discharge.

Sgt. Godfrey received a copy of a memo from Lt. Fagan's criticizing Plaintiff Griffith. However, he did not speak with Lt. Fagan about it and accepted everything in it as true. Sgt. Godfrey did not conduct an investigation into the charges in Lt. Fagan's memo. Lt. Fagan's memo basically states Plaintiff Griffith left work early one morning and states that she had been impolite and discourteous to the police officers on his shift. Sgt. Godfrey, in his memo attached to the Allegation of Misconduct, states that Plaintiff Griffith was insubordinate to officers.

No one ever advised Plaintiff Griffith which officers were complaining about her. Sgt. Godfrey has refused to tell anyone which officers complained about Plaintiff Griffith. Lt. Fagan's memo does not identify any police officers who complained about Plaintiff Griffith, except for one minor incident with Patrolman O'Neill, or specify any incident of insubordination.

Because Plaintiff Griffith was never advised who was complaining about her or specify an incident, she was not able to defend herself and she was deprived her of an opportunity to know the charges and bring in rebuttal evidence. Importantly, the evidence shows that when

5

Plaintiff Griffith was counseled about performance or behavior issues in the past, she corrected the situation and the issues did not occur again.

The department policy was that, when a person was assigned to a 12 hour shift, the first eight hours were required and the remaining four hours were voluntary. If the extra four hours were worked, the employee was paid overtime. At the time of writing his Memo, Lt. Fagan did not know how the shifts worked for corrections officers. At the time that Plaintiff Griffith was terminated, Lt. Fagan was unaware that the corrections officers on a 12 hour shift did not have to work the last four hours. Lt. Fagan complained that plaintiff Griffith left early; however such was done after the eight hour shift was completed and notice was given by plaintiff.

The schedule at one time for the corrections officers was eight hour shifts. The schedule was changed to twelve hour shifts. The corrections officers were told that they had to work eight hours when assigned, and extra time for either a twelve hour shift or a ten hour shift was voluntary, as long as the corrections officers worked 40 hours in a week or 80 hours in the two week pay period. The ten hour shift was mandatory only if the extra two hours were needed to work 40 hours in a week. There was no instruction or general order that stated how the scheduling worked. If one does not need the extra two hours on a scheduled 10 hour shift (or the extra four hours on a scheduled 12 hour shift) to meet the 40 hour requirement, then the extra two hours (or four hours) are voluntary.

At times, no corrections officer is on duty and no one is scheduled to be on duty. Sgt. Fagan does not know when Plaintiff Griffith starts her shift as he is not on duty when she starts. The ten hour shift is required only if it is needed for an employee to obtain the 40 hours required during a week. If Plaintiff Griffith worked an additional shift during the week, then she was not required to work the full 10 hour shift.

If a corrections officer comes on duty early and there is no corrections officer on duty to relieve, the on-coming corrections officer will start his/her shift early. If Plaintiff Griffith reported early and there was no corrections officer to relieve, then Griffith should start her shift early in order to feed the prisoners the evening meal. On August 22, Plaintiff Griffith was scheduled to work 7 pm to 3 am.

When bond money is posted, the corrections officer must complete a log and deposit the money in safe drop box. When the corrections officer departs, she must turn the booking sheets into dispatch. On August 25, 2008, after leaving the booking area, Plaintiff Griffith went to the bond deposit area, filled out the appropriate log and form, went to the dispatch area to leave the booking sheets and went to the rest room to administer medication to herself for her diabetes.

Department General Order 2-17 provides that an employee should be counseled about undesired behavior in an attempt to get the employee to correct the behavior. Lt. Fagan never counseled Plaintiff Griffith about the behavior he complained of, and is not aware of anyone else doing so. Lt. Fagan never complained to anyone about Plaintiff Griffith's behavior prior to the writing of his memo. The purpose of Lt. Fagan writing the memo was to have the problems addressed, not to have Plaintiff Griffith fired. Lt. Fagan admits that his officers were rude and curt to Plaintiff Griffith, including that Officer O'Neill was rude to Plaintiff Griffith in the one incident mentioned in his memo. When Lt. Fagan asked Plaintiff Griffith to stay late, she did. Lt. Fagan never gave Plaintiff Griffith an order to stay late and Plaintiff Griffith then did not. For instance, Lt. Fagan sent an email to Plaintiff Griffith on August 15 asking her to stay late and she did.

On August 22, 2008, Plaintiff Griffith sent an email to Lt. Fagan that her shift would be over at 3:00 am on August 23, 2008. Lt. Fagan did not ask Plaintiff Griffith to stay late at this

7

time. On August 22-23, 2008, later in the evening, Lt. Fagan sent an email to dispatch to tell Plaintiff Griffith not to leave, for reasons unknown, he did not send it to Plaintiff Griffith.

Plaintiff Griffith had a procedural right to know the basis of the charges against her so she could rebut them in a meeting with a Chief of Police

Lt. Fagan did not give, and is not aware of anyone who gave, his memo to Plaintiff Griffith.  Lt. Fagan has never asked or heard Plaintiff Griffith's side of the story regarding his complaints. Lt. Fagan did not talk with anyone about his memo, including Sgt. Godfrey or the Chief.  After he wrote the memo, he started his three days off and when he returned he found out Plaintiff Griffith had been fired.

Chief Karabas did not speak to any of the officers on Lt. Fagan's shift who complained about Plaintiff Griffith.  No one told Chief Karabas details or specifics on how Plaintiff Griffith was allegedly uncooperative, he was told that in general terms.

The attachments to the two Allegations of Misconduct prepared by Sgt. Godfrey on August 27 were never provided to plaintiff prior to her discharge or her meeting with the Mayor. Plaintiff Griffith was not aware of the contents of Lt. Fagan's memo or of Sgt. Godfrey's memo when she had a conference with the Mayor to appeal her termination, so she could not present rebuttal evidence at that time.

Sgt. Godfrey states that complaints were made to him against Plaintiff Griffith by police officers.  No one has ever told Plaintiff Griffith who those police officers were or what the complaints were. Sgt. Godfrey has refused to disclose who the police officers were.

Police Department General Order 3-3 provides that a member of the police department is entitled to a hearing with the Chief of Police where the employee may present evidence and

witnesses. This General Order 3-3 establishes procedures to be followed and gives employees certain rights.

Plaintiff Griffith sent a memo in August, 2008 to the Chief of Police requesting a hearing regarding the charges against her. The Chief of Police did not grant Plaintiff Griffith a hearing. Chief Karabas did not give a copy of Lt. Fagan's memo to Plaintiff Griffith or ask her side of the story when he discharged plaintiff. Chief Karabas gave no consideration to allow Plaintiff Griffith to come in and defend herself. The memo of Lt. Fagan had an erroneous date on it on which certain events were stated to have occurred. Chief Karabas noticed the discrepancy but did not ask for any clarification or explanation before he made the decision to terminate Plaintiff Griffith. Chief Karabas is not aware of any type of assistance or counseling to Plaintiff Griffith regarding any claimed deficiency in her performance, except what she may have received from Sgt. Godfrey at the time of her evaluation. Chief Karabas made the determination to terminate Plaintiff Griffith based upon Lt. Fagan's memo, before he received the two Allegations of Misconduct dated August 27, 2008 prepared by Sgt. Godfrey. The memo of Lt. Fagan was received on August 25, and the decision to terminate Plaintiff Griffith was made on August 26.

The final August work schedule is dated August 29. This shows that Plaintiff Griffith worked an eight hour shift on August 25. The original August schedule was made on August 1 and does not show Plaintiff Griffith scheduled to work August 25. The schedule was revised.

Plaintiff Griffith is a diabetic. Diabetics are required to eat regularly. Plaintiff Griffith is required to take shots that are to be taken before eating. Often, Plaintiff Griffith will go to the rest room and give herself the required shot before she gets off work. When Plaintiff Griffith arrived on August 22, 2008, she arrived early. Corrections Officer Smalligan had left and there was no corrections officer on duty. CO Smalligan had left a note to Plaintiff Griffith on the

monitor that the prisoners needed to be fed. Plaintiff Griffith then started work early and started the process to feed the prisoners.

There is no sign in/out sheet for corrections officers. When leaving, if there is no replacement coming on duty, then the departing corrections officer checks out with dispatch.

Plaintiff Griffith has diabetes.  Her diabetes is not always under control.  It is necessary for her to have proper diet and sleep.  Plaintiff Griffith is senior to two to her corrections officers. She was placed primarily on the midnight shift so a new corrections officer could be trained. She was told she would return to the day or evening shifts when the new corrections officer was trained. She requested to be returned to the day or evening shift at various times, including on August 27, 2008 by memo.

No one told Plaintiff Griffith that she was uncooperative with police officers, was not working well with other police officers or that police officers were complaining about her. Plaintiff Griffith was never counseled about complaints from other police officers.

Shortly before being fired, Plaintiff Griffith heard a police officer make inappropriate comments to a prisoner.  She complained about this to Sgt. Godfrey.  Shortly before being fired, Plaintiff Griffith reported to Lt. Lowery that a prisoner had been in jail for 11 days without seeing a judge, and the City is only to hold a prisoner without seeing a judge for seven days maximum.  The prisoner then had to be released. Shortly before being fired, plaintiff complained that pornographic sites were on the computer at her work station which was used by corrections officers and that there were some pornographic magazines in a storeroom

Plaintiff Griffith had a property interest in her employment as classified employee. *Board of Regents  v. Roth,* 408 US 654 (1972).  An employee has a protected property interest in his employment when he may only be fired for cause as set forth in the statute or ordinance.

*Hopkins v. Sanders*, 199 Fed. 3d 968 (8th Cir. 1999). Generally, a pre-termination hearing is required before an individual in public employment can be terminated. *Cleveland Board of Education v. Loudermill*, 470 US 532 (1985).

A classified public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence and an opportunity to present his side of the story. *Cleveland Board of Education v. Loudermill*, 470 US 532 (1985). A pre-termination hearing need not be formal, but the employee should be informed of the charges against him and given an opportunity to rebut those charges. *Loudermill, supra.*

The notice of charges must fairly apprise the employee of the conduct for which the employee's removal is sought. *Sorbello v. City of Maplewood*, 610 S.W.2d 375 (Mo. App. 1980). The purpose the notice is to inform the employee of the reason for the discharge to enable the employee to prepare a defense. A notice that states that the employee "failed to perform the duties of" a certain job position is not sufficient. *Brixey v. Personnel Advisory Board*, 607 S.W.2d 825 (Mo. App. 1980).

The evidence is that Plaintiff Griffith worked at least eight hours on August 22-23. When she reported for duty, the prior corrections officer had already left. The prisoners were entitled to their evening meal, and Plaintiff Griffith started the preparation and service of the meal. After she left the booking area, she then had to administer medication to herself for her diabetes, bring the booking sheets to dispatch and complete the bond log and form and deposit the bond money received.

The evidence will be that when scheduled, a corrections officer has to work eight hours of a shift, any extra hours are voluntary. The corrections officers are required to work 40 hours a

week or 80 hours over two weeks.  If they work more than eight hours in a day, they are paid overtime. There is no instruction or general order that explains this procedure.

Plaintiff Griffith's final pay check stub shows that she had worked 66.5 hours in the pay period ending August 31, 2008.  She was terminated on August 28, 2008. She was scheduled to work August 29 and 30.  This shows she was working the required number of hours that week and did work on August 25, 2008.

The Chief of Police made his determination to terminate the employment of Plaintiff Griffith before the two allegations of misconduct were received by him, which were prepared by Sgt. Godfrey on August 27.  The decision was made entirely on Lt. Fagan's memo. Whether Plaintiff Griffith was to work 10 hours on August 22-23 was not considered by him.

Plaintiff Griffith requested a hearing with the Chief of Police to discuss the allegations of misconduct.  She was entitled to such a hearing but was not granted one. Plaintiff Griffith was entitled to know the nature of the charges against her.  She was entitled to know who was complaining about her and the offending conduct. Plaintiff Griffith was never advised of who was making any complaints about her.

The Chief testified that the Allegation of Misconduct relating to use of sick leave was not considered in making the determination to terminate employment.  The Mayor's letter also states the Allegations of Misconduct of August 27 were not considered in making the decision to terminate Plaintiff Griffith's employment.

All of the testimony was that no one had to work more than eight hours in a shift, working more than eight hours was voluntary, unless the hours were needed to work 40 hours in a week.

As a matter of due process, Plaintiff Griffith was entitled to receive a copy of Lt. Fagan's memo, receive a pre-termination meeting in which she could defend herself, and receive a hearing with the Chief of Police in which she could defend herself.  None of this occurred.  Plaintiff Griffith could not present evidence to the Mayor in the meeting he had with Plaintiff Griffith, as the memo of Lt. Fagan was unknown at the time to Plaintiff Griffith, she had not received any attachment to an allegation of misconduct, and no one had advised her of the nature of the charges.

Plaintiff Griffith requested a hearing before the Chief of Police relating to the two charges of misconduct prepared on August 27, 2008.  Although the Chief had not imposed discipline, there was a recommendation for discharge of employment.  It is reasonable and a fair intent of the policy of the Police Department to allow an employee to seek a hearing with the Chief of Police to defend against allegations before serious punishment is imposed. Plaintiff Griffith was entitled to, at least, a pre-termination hearing. Lt. Fagan and Chief Karabas testified that this was proper procedure.  This is the procedure used in the Police Department when some suggested adverse employment action is recommended on an Allegation of Misconduct.

Plaintiff Griffith was entitled to have the opportunity to present her side of the story to the Chief and the Mayor.  The Chief of Police never gave her this opportunity.  The Mayor gave a meeting, but since Plaintiff Griffith had not been given Lt. Fagan's memo or Sgt. Godfrey's memo, she did not know the nature of the charges against her and could not present an adequate rebuttal or defense.

SHER CORWIN  LLC

/s/ Michael D. _Hart_____
Michael D. Hart, #3333
190 Carondelet Plaza, Suite 1100
St. Louis, MO 63105

13

(314) 721-5200
Fax (314) 721-5201
mhart@shercorwin.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2010, a copy of the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system to the following:

Mark H. Zoole
Mark Zoole and Associates
1200 South Big Bend Blvd.
St. Louis, Missouri 63117

/s/ Michael D. Hart